IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JANICE L. BURNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:14-cv-2449 |
| | ) | |
| ALEGRIA LIVING & | ) | **JURY TRIAL DEMANDED** |
| HEALTHCARE, INC., d/b/a | ) | |
| Brookside Retirement | ) | |
| Community, | ) | |
| a Kansas corporation, | ) | |
| | ) | |
| Service at: | ) | |
| 700 W. 7th St. | ) | |
| Overbrook, KS 66524 | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW Plaintiff Janice Burnett, by and through her
attorney, and for her causes of action against Defendant Alegria
Living & Healthcare, Inc., d/b/a Brookside Retirement Community
("Alegria") for violations of the Americans with Disabilities
Act Amendments Act ("ADAAA"); violations of the Kansas Act
Against Discrimination; and for wrongful discharge in violation
of public policy, states as follows:

### THE PARTIES

1. Janice Burnett is a citizen of the State of Kansas,
   residing in Ottowa, Kansas.  At all times relevant to the
   allegations stated herein, Ms. Burnett was a resident of
   Ottowa, Kansas.  Ms. Burnett has a neurological disorder

known as Chiari Type I Malformation, which is a structural defect in the cerebellum causing neck pain, balance problems, muscle weakness, numbness in extremities, dizziness, vision problems, difficulty swallowing, and other symptoms which substantially limit one or more major life activities. Chiari Type I Malformation is a "disability," as defined in 42 U.S.C. § 12102, and in K.S.A. § 44-1002(j).

2. Alegria is a corporation created pursuant to the laws of the state of Kansas, with its principal place of business in Overbrook, Kansas. Alegria is an "employer," as defined in 42 U.S.C. §12111(5)(A), and in K.S.A. §44-1002(b). Alegria is a "covered entity" as defined in 42 U.S.C. §12111(2).

**JURISDICTION AND VENUE**

3. This Court has original jurisdiction over Ms. Burnett's ADAAA claims under 28 U.S.C. §§ 1331 and 1343, which provide for jurisdiction of this Court in civil actions arising under the laws of the United States, or to recover damages under any Act of Congress providing for protection of civil rights. Ms. Burnett filed a timely charge of Discrimination with the EEOC, and was issued a Right to Sue letter dated June 10, 2014, and received June 12, 2014, a copy of which is attached hereto as Ex. A. All conditions

precedent to the institution of this lawsuit have been fulfilled.

4.  This Court has jurisdiction over Ms. Burnett's claim under the Kansas Act Against Discrimination and her Kansas common law claim for wrongful discharge in violation of public policy under 28 U.S.C. § 1367, which provides for supplemental jurisdiction over all other claims that are so related to Plaintiff's claim under the ADAAA, that they form part of the same case or controversy under Article III of the United States Constitution.

5.  Venue is proper in the United States District Court for the District of Kansas under 28 U.S.C. § 1391(a)(2), as a substantial part of the events giving rise to Ms. Burnett's claims occurred in this District.

## FACTS COMMON TO ALL COUNTS

6.  Alegria does business in Overbrook, Kansas, as Brookside Retirement Community, providing skilled nursing services and living accommodations to residents.  Alegria contracts with the Center for Medicare and Medicaid Services and with the Veteran's Association, and receives federal funding from those entities.

7.  On July 25, 2011, Ms. Burnett was hired by Alegria to work as an MDS Coordinator at the Brookside Retirement Community facility.  The objective of an MDS coordinator is to

promote the physical and emotional well-being of nursing facility residents. They use a Resident Assessment Instrument (RAI) to gather information from residents and their families during initial and periodic interviews. The MDS covers such areas as the patient's mood, behavior patterns, cognitive ability, and nutrition needs. Ultimately, an MDS coordinator is responsible for implementing and monitoring the residents' individual care plans to ensure their effectiveness.

8. At her interview for the position of MDS Coordinator at Brookside with Alegria employees Tammy Conklin and Colleen Cyr, and Alegria owner Susan Averill, Ms. Burnett explicitly made reference to the existence of her disability.  She mentioned that her disability limited her to working no more than eight hours a day, and forty hours a week.  She also completed a medical history form on the date of hire (July 25, 2011), checking boxes indicating that she suffered from neck pain, numbness, impaired coordination, and headaches.

9. Ms. Burnett served as the MDS Coordinator at Alegria for almost one year, without significant personnel or disciplinary issues.

10. In approximately early June, 2012, Brookside Executive Director Levi Davis approached Ms. Burnett, and asked her

"how is everything going?"  Ms. Burnett replied, "Busy.  I am overwhelmed with all the new admissions and trying to keep up."  Mr. Davis ignored this statement, and mentioned that Colleen Cyr, the Brookside Director of Nursing, would be commencing work on a home health services program, and that Ms. Burnett would need to take over duties previously performed by Ms. Cyr.  Specifically, Mr. Davis stated that Ms. Burnett would need to take over data entry duties previously performed by Ms. Cyr on a software system called Care Tracker.

11. Data entry duties using Care Tracker had not been an essential function of the MDS Coordinator position at Brookside during Ms. Burnett's entire tenure there, and it was not advertised as being part of the essential functions of the MDS Position prior to Ms. Burnett's employment there.

12. Ms. Burnett informed Mr. Davis that she was already overwhelmed, and wasn't sure how she was going to find time to perform the additional duties.  Mr. Davis again ignored this statement.

13. On Saturday, June 16, 2012, Alegria hosted a celebration for Father's Day.  Ms. Burnett did not attend this event for personal reasons, including symptoms relating to her disability.

14. On Monday, June 18, 2012, Ms. Burnett was questioned by Alegria owner Susan Averill and Brookside Executive Director Levi Davis concerning her whereabouts during the Father's Day event.  During this conversation, Ms. Burnett noted her many limitations due to her disability, and also reminded Ms. Averill and Mr. Davis that she had explained her disability during her initial interview.  Ms. Averill responded, "Thank you for telling us that."  Ms. Averill and Mr. Davis intimidated Ms. Burnett concerning her failure to attend the Father's day event, asking, "What if no one had shown up?"

15. After this conversation with Ms. Averill and Mr. Davis, a few days later Ms. Burnett brought records regarding her disability to Brookside and placed a copy in Mr. Davis's mail box.  She then verbally notified Mr. Davis that she had put the records in his mailbox.

16. The next day, Tammy Conklin (the HR Director at Brookside) and Mr. Davis went to Ms. Burnett's office, shut the door, and asked why Ms. Burnett had brought the disability papers to Mr. Davis.  Ms. Burnett responded that after her discussion with Mr. Davis and Ms. Averill regarding the limitations imposed by her disability, and their seeming lack of regard for those limitations, she felt she should provide records for the employer's benefit.  Ms. Conklin

then stated, with the records in her hand, "I am going to mark them as received today."  Ms. Burnett said, "That's fine, but you were made aware of my disabilities during my applicant interview."

17. The discussion then turned to the medical history and disability insurance paperwork which Ms. Burnett had filled out at the time she was hired.  Ms. Conklin asked Ms. Burnett about the reference to limiting "excessive work" in the paperwork, and Ms. Burnett explained that it meant more than eight hours a day or forty hours a week.  Ms. Conklin then stated that she knew Ms. Burnett "had some problems with headaches or light, or something, but didn't know the extent of [her] problems."

18. Subsequently, on July 3, 2012, Mr. Davis gave Ms. Burnett a detailed printout of additional duties to be completed by July 23rd, 2012, to include training for and takeover of the Care Tracker system.  The printout stated: "Goal: To have Janice fully take over the responsibilities of the MDS Coordinator including Management and Maintenance of the Care Tracker system by July 23rd."  Management and maintenance of the Care Tracker system had never been part of the responsibilities for the MDS coordinator prior to that time.

19. Ms. Burnett spent the next several weeks at Brookside completely overwhelmed, in an effort to complete her existing responsibilities, and to train for and implement her new responsibilities.

20. On July 27, 2012, Ms. Burnett authored a formal written grievance to Mr. Davis, and delivered it to him on August 1, 2012.  The grievance explicitly states, *inter alia*:

   a. "I want to file a formal grievance regarding the unreasonable and unrealistic demands placed on my workload given to me in writing on July 3rd, 2012."

   b. "I have Arnold's Chiari Malformation I (ACM I), with an occipital decompression and laminectomy.  It is on the National Organization for Rare Disorders (NORDS).  It is an invisible disability which refers to symptoms such as debilitating pain, fatigue, dizziness, weakness, cognitive dysfunctions, learning differences and mental disorders, as well as hearing and vision impairments.  These are not always obvious to the onlooker, but can sometimes or always limit daily activities, range from mild challenges to severe limitations and vary from person to person.  An extensive list of Chiari symptoms is attached."

    c. "On July 3, 2012, I was given a detailed printout of the additional duties to be completed by July 23rd while performing my current duties that I was hired to perform.  I believe these additions were added to make me perform beyond my physical limitations…"

    d. "It was never said but implied that if I did not complete these multiple tasks that I might be written up or fired."

    e. "How am I physically supposed to complete all these duties and work my eight hours a day, forty hours a week[?]"

    f. "There is not enough time to train myself and implement these duties in the time frame indicated, without working over numerous hours beyond my disability limitations.  It is not possible even with the current workload I have."

21. The same day, August 1, 2014, after reviewing this grievance, Mr. Davis and Scott Averill, one of the owners of Alegria, confronted Ms. Burnett at Brookside, with the grievance in hand.  Mr. Davis stated, "It seems from this that you just don't want to be here."  Mr. Davis and Mr. Averill told Ms. Burnett that she needed to go home, and asked her to collect her personal belongings.  Specifically, Mr. Averill stated, "You need to pack all of

your personal things, go home and take care of yourself."
Mr. Averill also stated, "[Brookside] is obviously not the
place for you, if you feel this way," indicating the
grievance letter he was holding.  Ms. Burnett was forced to
give up her keys, badge, flash drive, and other work
affects.  She was asked to spend time going through her
computer and explain certain things, apparently to help
transition her responsibilities to someone else.  She was
also given a box to pack her belongings, the box was put on
her office chair (which she personally owned), and she was
escorted from the building to her vehicle rolling her own
therapeutic chair.  This entire process took seventy-five
minutes.

22. Later that afternoon, Ms. Burnett received an email from
Mr. Averill.  Mr. Averill's email – sent to Ms. Burnett's
personal email account, as opposed to her work account –
states, *inter alia*:

   a. "Just wanted to follow up our conversation this
      morning and clarify a few things."

   b. "First of all, after reviewing your complaint, I
      immediately wanted to make sure you were afforded an
      opportunity to take care of yourself.  That is why I
      asked that you go home while I research your
      concerns.  Please understand you will be paid for

your full 8 hours today and will NOT have to take
any PTO hours."

c. "Also, it would help me a lot if you could clarify
what you would like to do at this point.  It is
quite obvious from reading your 'formal grievance'
that, from your perspective, you don't perceive the
work environment at Brookside to be nurturing or
supportive."

d. "So please let me know if your desire is to continue
to work at Brookside.  If so, what will make the
work environment one in which you will enjoy your
day-to-day experience?  Please be as (sic) specific.
Possibly you have no desire to continue your
employment.  If this is the case, then we can
discuss a mutually beneficial way in which to sever
your employment.  Please let me know TODAY what your
desire and plans are… thanks!"

23. Ms. Burnett replied by email, stating, in relevant part:

a. "First of all, I did not know that we had a
conversation this morning.  It appeared to be one
sided from my perspective, you conversing, while I
listened.  I do not understand this perception of
yours that I need to take care of myself, as I said,
I am fine.  I do take care of myself."

b. "My perspective after being packed up by Levi, turning in my keys, badge, USB port, cleaning out my desk and leaving the premises at 10:15 am, that I was terminated from my position at BRC.  I believe my desires were quite explicit in the details that I provided in my grievance letter dated July 27, 2012 and delivered August 1, 2012.  I perceived my being escorted out as not only a retaliation to undermine and humiliate but also to put fear into staff members.  I did nothing wrong."

c. "It is my impression that my employment was severed per your request that I pack up my things and departure today under duress."

24. The next day, August 2, 2012, Mr. Averill sent an email to Ms. Burnett, stating, among other things:

a. "I had run into Brookside to pick something up and that is when I was informed of your grievance.  I reviewed your letter quite rapidly, determined that you were obviously upset and made the judgment call that it would be best for you to go home for the day (with pay) and allow me time to review more thoroughly your written grievance statement."

b. "I AM QUITE CONFIDENT YOU WILL AGREE THAT I NEVER ONCE USED THE WORDS 'FIRED' OR 'TERMINATED'… because

that was never my intent.  If that had been my
intent, please know that I would have made that very
clear… and I obviously would not have sent you the
email this afternoon attempting to clarify your
intent."

c. "So here is the current situation:  You are still
employed at Brookside Retirement Community.  Given
that you are still employed, what is your intent and
desire.  Do you want to continue your employment?  I
look forward to hearing from you… thanks!"

25. On August 3, 2012, after receiving the emails from Mr.
Averill assuring her that she was still employed at
Brookside, Ms. Burnett attempted to login to her work email
account.  She was unable to login, and received a notice
that her work email account had been disabled.

26. After taking a few days to consider Mr. Averill's emails,
Ms. Burnett replied to Mr. Averill by email from her
personal account at approximately 9:09 p.m. on Sunday,
August 5, 2012.  The reply stated, *inter alia*:

a. "The actions of that morning, from the delivery of
the grievance to Levi… to the presentation of the
intent by you and Levi in my office, the going
through the computer, passing off needed information
for the completion of my job duties, going through

13

my desk and files, packing up of my personal belongings, returning work related items and loading the things in my car took 75 minutes… It was and will be my belief that the intent of these actions was one of being terminated from BRC."

b. "The emails after my departure, gave time for everyone to ponder the impact and implications of the actions of the morning, that were an act of humiliation and retaliation for me."

c. "[T]he statement that I continue to remain as an employee of BRC negates the idea that I was terminated. It shows *attempts* to mediate the situation for damage control and regain organizational control. If I choose to decline your offer of employment, then I will be terminated for refusal to show up to work and served with papers."

d. "At this point, with difficult decision, I will return to work to perform my duties on 8/6/12 with continued disagreement of the intent as exhibited by retaliation and actions of 8/1/12. That is if you choose for me to return."

27. At 6:16 a.m. the next morning, Monday, August 6, 2012, Mr. Averill sent Ms. Burnett the following email: "Over the last several days, I have reviewed your letter of grievance

and the sequence of events that has transpired since that day.  I have been unable to corroborate your allegations. I have come to the conclusion it would be mutually beneficial to part ways… therefore you should not return to work today/Monday/August 6th.  You will be paid through last Friday, August 3.  I wish you well in your future endeavors."

28. Due to her treatment at Brookside during the time leading to her termination as well as the circumstances of the firing itself, Ms. Burnett has suffered depression and anxiety, and has been forced to seek continuing treatment and take medication for these conditions.

29. Ms. Burnett was able to find employment as an MDS Coordinator at another facility within two weeks of being terminated from her position at Brookside.  During the period of her unemployment, she suffered actual damages in the form of lost income.

## COUNT I

**ACTION FOR FAILURE TO CREATE A REASONABLE ACCOMODATION UNDER 42 U.S.C. § 12112(a) & (b)(5)(A) and under K.S.A. § 44-1009(8)**

30. For Ms. Burnett's cause of action against Alegria for failure to create a reasonable accommodation under 42 U.S.C. § 12112(b)(5)(A) and K.S.A. § 44-1009(8), Ms. Burnett incorporates by reference herein and makes a part

15

hereof each and every allegation set forth in paragraphs 1 through 29 of this Complaint.

31. Ms. Burnett is a "qualified individual with a disability," as such terms are defined in the ADAAA and the Kansas Act Against Discrimination, in that, as described in greater detail in paragraphs 1 through 29 *supra*, she is an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the MDS Coordinator position as it was advertised to her when she was an applicant, and as she performed the position for approximately 11 months prior to additional demands being made of her in July, 2012.

32. Alegria, by and through its owners, employees, and agents, was aware of Ms. Burnett's disability, through statements made by Ms. Burnett at the time of her interviews; paperwork completed by Ms. Burnett during the course of her employment; and the records submitted to her supervisors by Ms. Burnett in June, 2012.

33. Alegria failed to reasonably accommodate Ms. Burnett's disability, by assigning her additional tasks and expanding the scope of her duties as MDS coordinator beyond the limitations of her disability, despite her initial verbal complaints, and later her written grievance.

34. The requested accommodation – requiring someone else to complete the additional tasks assigned to Ms. Burnett on or about July 3, 2012 – would not have imposed an undue hardship on the operation of the business of Alegria, as these tasks had been fulfilled by another employee until that time.

35. As a direct and proximate result of Alegria's failure to accommodate her disability, Ms. Burnett has suffered monetary and compensatory damages in the form of lost income, humiliation, and emotional distress.

36. Alegria's refusal to accommodate Ms. Burnett's disability was knowing, willful and outrageous and was intended to cause injury to Ms. Burnett.  As a result, Ms. Burnett is entitled to an award of punitive damages in such sum as is fair, just and reasonable, in addition to any actual and compensatory damages, and an award of reasonable attorney's fees.

### COUNT II

**ACTION FOR TERMINATING EMPLOYMENT ON THE BASIS OF DISABILITY UNDER 42 U.S.C. §12112(a) and K.S.A. § 44-1009(1)**

37. For Ms. Burnett's cause of action against Alegria for terminating employment on the basis of disability under 42 U.S.C. § 12112(a) and K.S.A. § 44-1009(1), Ms. Burnett incorporates by reference herein and makes a part hereof

each and every allegation set forth in paragraphs 1 through
29 of this Complaint.

38. Ms. Burnett has a neurological disorder known as Chiari
Type I Malformation, which is a structural defect in the
cerebellum causing neck pain, balance problems, muscle
weakness, numbness in extremities, dizziness, vision
problems, difficulty swallowing, and other symptoms which
substantially limit one or more major life activities.
Chiari Type I Malformation is a "disability," as defined in
42 U.S.C. § 12102, and in K.S.A. § 44-1002(j).

39. Ms. Burnett is a "qualified individual with a disability,"
as such terms are defined in the ADAAA and the Kansas Act
Against Discrimination, in that, as described in greater
detail in paragraphs 1 through 29 *supra*, she is an
individual with a disability who, with or without
reasonable accommodation, can perform the essential
functions of the MDS Coordinator position as it was
advertised to her when she was an applicant, and as she
performed the position for approximately 11 months prior to
additional demands being made of her in July, 2012.

40. As described in greater detail in paragraphs 1 through 29
supra, Ms. Burnett was terminated under circumstances
giving rise to an inference that the termination was based
on her disability, including but not limited to the fact

that Ms. Burnett was asked to pack her belongings, turn in her work-related affects, and leave the premises on the very same day (and, according to Mr. Davis and Mr. Averill's own statements, because of the fact) that she submitted a written grievance concerning her disability.

41. Alegria cannot offer sufficient evidence of a non-discriminatory reason for Ms. Burnett's termination that is not actually a pretext designed to mask its act of discrimination.

42. As a direct and proximate result of Alegria's termination of Ms. Burnett because of her disability, Ms. Burnett has suffered monetary and compensatory damages in the form of lost income, humiliation, and emotional distress.

43. Alegria's termination of Ms. Burnett due to her disability was knowing, willful and outrageous and was intended to cause injury to Ms. Burnett.  As a result, Ms. Burnett is entitled to an award of punitive damages in such sum as is fair, just and reasonable, in addition to any actual and compensatory damages, and an award of reasonable attorney's fees.

<u>COUNT III</u>

**ACTION FOR RETALIATION, INTERFERENCE, COERCION AND
INTIMIDATION UNDER 42 U.S.C. § 12203(a) & (b)
and K.S.A. §§ 44-1009(4) & 44-1026**

44. For Ms. Burnett's cause of action against Alegria for
retaliation, interference, coercion and intimidation under
42 U.S.C. § 12203(a) & (b) and K.S.A. §§ 44-1009(4) & 44 ,
Ms. Burnett incorporates by reference herein and makes a
part hereof each and every allegation set forth in
paragraphs 1 through 29 of this Complaint.

45. In submitting her verbal and written grievances concerning
Alegria's failure to accommodate her disability as
described in further detail in paragraphs 1 through 29
supra, Ms. Burnett engaged in protected opposition to
discrimination on the basis of disability in violation of
the ADAAA.

46. Ms. Burnett suffered many adverse employment actions
contemporaneously with her acts of protected opposition, in
that Alegria, by and through its employees and agents,
coerced, intimidated, threatened, interfered with and
retaliated against Ms. Burnett in ways including, but not
limited to, the following:

    a. Supervisors had a closed door conversation with Ms.
       Burnett suggesting that she did something wrong by

failing to attend the Father's Day event due to her disability;

b. Supervisors had another closed-door conversation with Ms. Burnett about her submission of information and records concerning her disability.  During this conversation, as noted in greater detail above, HR Director Tammy Conklin inquired as to why these records were submitted, and minimized Ms. Burnett's disability, stating that she knew Ms. Burnett "had some problems with headaches or light, or something, but didn't know the extent of [her] problems."

c. Executive Director Levi Davis assigned Ms. Burnett to perform extra duties after having been told that she was overwhelmed and limited by her disability, including but not limited to giving Ms. Burnett a written memo stating "Goal: To have Janice fully take over the responsibilities of the MDS Coordinator including Management and Maintenance of the Care Tracker system by July 23rd," even though management and maintenance of the Care Tracker system had never been part of the responsibilities for the MDS coordinator prior to that time.

d. Mr. Davis and Mr. Averill confronted Ms. Burnett at Brookside on the very day that she had submitted her

written grievance regarding her disability.
Specifically, Mr. Davis stated, "It seems from this
that you just don't want to be here."  Mr. Davis and
Mr. Averill told Ms. Burnett that she needed to go
home, and asked her to collect her personal
belongings.  Specifically, Mr. Averill stated, "You
need to pack all of your personal things, go home
and take care of yourself."  Mr. Averill also
stated, "[Brookside] is obviously not the place for
you, if you feel this way," indicating the grievance
letter in his hand.  Ms. Davis was given a box to
pack her belongings, the box was put on her office
chair (which she personally owned), and she was
escorted from the building to her vehicle.

e. Mr. Averill sent Ms. Davis a series of coercive and
intimidating emails after terminating her employment
which clearly represent an effort to "take back"
Alegria's prior acts of retaliation, interference,
coercion and intimidation against Ms. Burnett, by
stating that she was "still employed at Brookside,"
but tacitly encouraging her to decide whether she
actually wanted to remain an employee.

f. Mr. Averill subsequently sent an email allegedly
terminating Ms. Burnett's employment despite her

acceptance of his offer to remain employed, and
stated a pretextual reason for her termination,
*i.e.*, that he had "reviewed her grievance" and had
been "unable to corroborate her allegations."

47. The allegations set forth in paragraphs 1 through 29 above
demonstrate that there is a causal connection between Ms.
Burnett's protected acts of opposing discrimination and
Alegria's many acts of retaliation, interference, coercion,
and intimidation.

48. As a direct and proximate result of Alegria's many acts of
retaliation, interference, coercion and intimidation
identified herein, Ms. Burnett has suffered monetary and
compensatory damages in the form of lost income,
humiliation, anger, and emotional distress.

49. Alegria's many acts of retaliation, interference, coercion
and intimidation were knowing, willful and outrageous and
were intended to cause injury to Ms. Burnett.  As a result,
Ms. Burnett is entitled to an award of punitive damages in
such sum as is fair, just and reasonable, in addition to
any actual and compensatory damages, and an award of
reasonable attorney's fees.

<u>COUNT IV</u>

**ACTION FOR WRONGFUL DISCHARGE UNDER THE "WHISTLEBLOWER" PUBLIC POLICY EXCEPTION TO KANSAS'S EMPLOYMENT-AT-WILL DOCTRINE**

50. For Ms. Burnett's cause of action against Alegria for wrongful discharge under the Kansas common law "whistleblower" public policy exception to the employment-at-will doctrine, Ms. Burnett incorporates by reference herein and makes a part hereof each and every allegation set forth in paragraphs 1 through 49 of this Complaint.

51. In committing the many acts described in paragraphs 1 through 49 of this Complaint, Alegria, by and through its employees and agents, violated clear public policies against discrimination on the basis of disability embodied in both the ADAAA and the Kansas Act Against Discrimination.

52. Ms. Burnett reported these many violations of public policy to the management of her company in the form of both her verbal objections to such conduct, and the written grievance she presented to Alegria management employees on August 1, 2012.

53. Alegria's termination of Ms. Burnett was an act of retaliation for Ms. Burnett's reporting of Alegria's violations of public policy to Alegria management.

54. Alegria cannot offer sufficient evidence of a non-retaliatory reason for Ms. Burnett's termination that is not actually a pretext designed to mask its act of retaliation.

55. Alegria's discharge of Ms. Burnett was wrongful, tortious and in violation of Kansas law and public policy.

56. As a direct and proximate result of Alegria's wrongful discharge of Ms. Burnett in violation of public policy, Ms. Burnett has suffered monetary and compensatory damages in the form of lost income, humiliation, anger, and emotional distress.

57. Alegria's wrongful discharge of Ms. Burnett in violation of public policy was knowing, willful and outrageous and was intended to cause injury to Ms. Burnett. As a result, Ms. Burnett is entitled to an award of punitive damages in such sum as is fair, just and reasonable, in addition to any actual and compensatory damages.

**JURY TRIAL DEMAND**

Ms. Burnett demands a jury trial pursuant to the Seventh Amendment to the Constitution of the United States, as to all claims for damages.

**PRAYER FOR RELIEF**

WHEREFORE, Ms. Burnett prays for judgment against Alegria for actual damages in an amount to be proven at trial including

all lost wages; for compensatory damages in an amount to be proven at trial for emotional distress and humiliation; punitive damages in an amount that is fair, just and reasonable; for reasonable attorney's fees; for all costs and expenses of the action and for any other relief deemed appropriate by the Court.

Respectfully submitted,

**JOHNSTON LAW FIRM LLC**

By:   /s/ J. Justin Johnston
      J. Justin Johnston  KS#20101
      811 Grand Blvd., #101
      Kansas City, MO 64106
      Tel: (816)739-4538
      Fax: (816)421-5403
      jjj@johnstonlawkc.com

      ***ATTORNEY FOR PLAINTIFF***